IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


SARAH A. TALLEY           )
     Plaintiff           )
                        )
v.                       )     No. 3:10-1217
                        )
CAROLYN W. COLVIN,     )
     Acting Commissioner of    )
     Social Security[1]       )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), as provided by the Social Security Act ("Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 13) should be GRANTED to the extent that the case should be remanded to the Commissioner.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

# I. INTRODUCTION

On February 8, 2007, the plaintiff filed applications for SSI and DIB, alleging a disability onset date of August 23, 2006, due to daily migraine headaches, daily use of a "walking stick," and pain in her low back, hips, and legs. (Tr. 128-33, 150, 155.) Her applications were denied initially and upon reconsideration. (Tr. 85-88, 93-96.) A hearing was held before Administrative Law Judge ("ALJ") Daniel Whitney on December 4, 2009. (Tr. 31-77.) On December 18, 2009, the ALJ issued an unfavorable decision (tr. 16-26), and on November 3, 2010, the Appeals Council denied the plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

# II. BACKGROUND

The plaintiff was born on January 29, 1961 (tr. 37), and she was forty-five years old as of her alleged onset date. She is married, has an eighth-grade education, and has previously worked as a laundry aide in a nursing home. (Tr. 36, 38, 40.) She has not worked since 2006. (Tr. 37, 41.)

## A. Chronological Background: Procedural Developments and Medical Records[2]

The plaintiff regularly presented to Dr. John W. Bacon between November 2004, and October 2009.[3] (Tr. 324-49, 503-17.) In addition to other ailments, Dr. Bacon treated the plaintiff for low back, shoulder, and knee pain. *Id.* In a letter dated December 15, 2004, Dr. Bacon opined

---

[2] The Court's summary of the plaintiff's medical record will focus on impairments that are relevant to the issues raised in the plaintiff's memorandum.

[3] The Court made every attempt to decipher the medical evidence of record; however, Dr. Bacon's treatment notes are largely illegible.

that the plaintiff had "an impingement syndrome of her right shoulder and arthritic changes in her knees." (Tr. 331.)

Between January 2005, and July 2009, the plaintiff frequently presented to several different emergency rooms and other health care providers with a variety of maladies, often including headaches and associated problems such as sinus congestion, fatigue, weakness, aches, sleep disturbance, light-headedness, dizziness, numbness in her face and extremities, and blurred vision. (Tr. 234-35, 238, 241, 243, 301-02, 308, 363-409, 453-54, 457-59, 469, 474-79, 490-93.)  Her headaches were treated with many different medications including Vicodin, Motrin, Tylenol, Inapsine, Toradol, Benadryl, Nubain, Vistaril, Fioricet, Decadron, Compazine, Ultram, Hydrocodone, and Tramadol.  (Tr. 238, 241, 243, 301, 308, 363-409, 453, 457, 469, 471-72, 474, 478-79, 492.)

Multiple brain scans were negative.  A July 13, 2005, CT scan of the plaintiff's brain was negative (tr. 431), and an August 10, 2006 CT scan revealed a "[s]table CT appearance of the brain with no acute interval change" when compared to the July 2005 scan.  (Tr. 258, 425.)  A February 6, 2008 brain MRI also returned negative (tr. 418), and a magnetic resonance angiography ("MRA") of the plaintiff's Circle of Willis[4] revealed "[n]o evidence for hemodynamically significant stenosis or aneurysmal dilatation."  (Tr. 417.)  On December 9, 2008, the plaintiff presented to the Sumner Regional Medical Center ("Sumner") emergency room with a headache, "left arm 'heaviness and pulling,'" "left-sided facial numbness," hot flashes, and occasional blurred vision.  (Tr. 368.)  The

---

[4] The Circle of Willis, also known as the circulus arteriosus cerebri, is the "cerebral arterial circle: the important polygonal anastomosis formed by the internal carotid, the anterior and posterior cerebral arteries, the anterior communicating artery, and the posterior communicating arteries." Dorland's Illustrated Medical Dictionary 367-68 (30th ed. 2003) ("Dorland's").

attending physician noted that the plaintiff had similar symptoms in February 2008, and that a brain scan had been normal on that date. (Tr. 369.) The plaintiff underwent a brain MRI/MRA, which revealed "no gross abnormality" (tr. 410),[5] and she was diagnosed with "[s]ensory disturbance." (Tr. 369.) She later underwent a CT scan of her head on March 12, 2009, that also returned normal. (Tr. 463, 494.)

In addition to seeking treatment for headaches, the plaintiff frequently presented to various medical care providers with pain in her low back, shoulders, hips, and extremities, often accompanied by tingling, numbness, and weakness. (Tr. 237, 243, 305-07, 448-49, 465-67, 478-89, 492.) She often visited Mr. Tim O'Leary, a physician's assistant at ClinicCare in Gallatin, Tennessee, and he diagnosed her with, *inter alia*, osteoarthrosis, cervicalgia, shoulder sprain, hypertension, malaise/fatigue, depressive disorder, insomnia, migraine headaches, abdominal pain, neuropathy, radiculopathy, and lumbago. (Tr. 465-93.) The plaintiff often reported to Mr. O'Leary that her shoulder and back pain "moderately limit[ed]" her activities. (Tr. 226, 465, 467, 471, 478, 482, 488, 492.) Medical care providers prescribed several different pain medications and advised her to apply ice, exercise, and stretch. (Tr. 237, 243, 449, 465, 467, 492-93.) She began physical therapy on January 29, 2007, but was discharged due to "poor attendance" on March 1, 2007. (Tr. 337-39.)

Objective testing of the plaintiff's orthopedic complaints also returned negative. MRIs of her right shoulder and cervical spine on December 6, 2005, were normal. (Tr. 429-30.) An October 10, 2006 ultrasound of her right leg was negative, revealing "[n]o evidence of a deep venous

---

[5] The doctor performing the brain scan noted that "[t]he study [was] severely limited by motion" (tr. 410), and the plaintiff declined to repeat the procedure under sedation. (Tr. 369.)

thrombosis in the right lower extremity" with "normal compressibility" and "normal respiratory variation and augmentation" of the deep venous system. (Tr. 233, 257.) Lumbar MRIs ordered by Dr. Bacon on October 23, 2006, and March 4, 2007, showed a normal lumbar spine (tr. 346-47, 422, 424), and an MRI of her right hip on March 4, 2007, was also normal. (Tr. 345, 423.)

The plaintiff presented to Dr. Hailu Kabtimer in Hendersonville, Tennessee, on a few occasions between November 7, 2006, and February 20, 2007, with low back pain and weakness and numbness in her right lower extremity. (Tr. 268-73.) During this time, Dr. Kabtimer diagnosed her with hypertension, obesity, low back pain, lumbar radiculopathy, "asthma/COPD," and arthritis.[6] (Tr. 269-73.) On February 20, 2007, Dr. Kabtimer found that she had "[n]o misalignment, defects or deformities," full range of motion, intact joints, full muscle strength and tone, and "[n]o muscle atrophy or weakness." (Tr. 269.)

On May 21, 2007, Dr. Bacon completed a doctor's note opining that the plaintiff was "no longer able to work. Her condition is permanent." (Tr. 334.) This form contained no specific functional limitations or explanations for Dr. Bacon's conclusion. On May 22, 2007, Dr. Bacon completed a State of Tennessee application for a temporary disability parking placard for the plaintiff. (Tr. 335.) On the form, Dr. Bacon indicated that the plaintiff used a "cane/walker" and that her disabilities of sciatica and low back pain were permanent. *Id.*

On June 11, 2007, Dr. Charles Colvin, a nonexamining DDS consultative physician, completed a Physical Residual Functional Capacity ("RFC") assessment. (Tr. 292-99.) Dr. Colvin opined that the plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; stand and/or walk about six hours in an eight-hour workday; and sit about six hours in

---

[6] The handwritten portions of Dr. Kabtimer's treatment notes were also largely illegible.

an eight-hour workday. (Tr. 293.) He opined that the plaintiff could push and/or pull without limitation and could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl but could only occasionally stoop and could never climb ladders, ropes, or scaffolds. (Tr. 293-94.) Additionally, he limited the plaintiff from concentrated exposure to extreme cold or heat and hazards such as machinery and heights. (Tr. 296.) Dr. Colvin noted that the plaintiff used a cane but that it was not prescribed. (Tr. 293.)

On June 13, 2007, the plaintiff presented to the Hendersonville Medical Center emergency room with "intense pain" in her right upper buttocks. (Tr. 301.) The examining physician noted that she "walk[ed] with the assistance of a cane, however, her gait [was] only slightly antalgic." *Id.* She was "minimally tender" to palpation of her right lumbar spinal and demonstrated "a negative straight leg raise bilaterally." *Id.* She was diagnosed with an "[e]xacerbation of chronic lumbar back pain," prescribed pain medication, and advised to apply moist heat, change positions frequently, and avoid bending and lifting. *Id.*

Dr. Albert Gomez, a DDS consultative physician, physically examined the plaintiff on October 24, 2007 (tr. 350-53), and observed that the plaintiff "[p]resented walking with a cane" and that "[w]ithout a cane, she ha[d] a limp." (Tr. 351.) Dr. Gomez noted that the plaintiff demonstrated "moderate tenderness to palpation of the lumbar spine" and got "on and off of the exam table with moderate difficulty" but had full range of motion in her back, shoulders, elbows, wrists, fingers, and ankles. (Tr. 351-52.) Her hips had full range of motion, except for flexion at 90 degrees, and her hip joints were mildly tender to palpation. (Tr. 352.) Both of her knees "showed flexion [at] 110 degrees with normal extension" and no tenderness to palpation. *Id.* The plaintiff was unable to do the tandem walk, heel walk, or toe walk and could not squat, but she was able to stand on one leg

normally.  *Id.*  The plaintiff told Dr. Gomez that "her cane was prescribed by her physician," and he noted that "[i]t is believed that the [plaintiff] would require her cane for balance during ambulation."  *Id.*  His impression was chronic low back pain, degenerative joint disease, obesity, and chronic headaches, and he opined that the plaintiff "could occasionally lift 20 pounds in an 8-hour workday" and "stand and/or sit for at least 6 hours in an 8-hour workday with normal breaks." (Tr. 352-53.)

On December 14, 2007, Dr. Denise Bell, a nonexamining DDS consultative physician, completed a physical RFC assessment.  (Tr. 354-61.)  Dr. Bell opined that the plaintiff was capable of lifting and/or carrying fifty pounds occasionally and twenty-five pounds frequently; standing and/or walking about six hours in an eight-hour workday; and sitting about six hours in an eight-hour workday.  (Tr. 355.)  Dr. Bell found that the plaintiff had no limitations pushing or pulling, and no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 355-58.)  She noted that the plaintiff's medical record contained "no objective findings to support need for cane." (Tr. 360.)

On November 13, 2008, Mr. O'Leary wrote a "To Whom It May Concern" letter, reporting that the plaintiff suffered from "ongoing health problems that have begun to cause her a lot of stress and depression.  She suffers from COPD with chronic bronchitis, fatigue, osteoarthritis of her shoulders, and low back pain.  All of these problems have contributed to her current state that involves her depression."  (Tr. 473.)

On March 11, 2009, the plaintiff was taken by ambulance to the Sumner emergency room with "[c]ough, myalgias and headache." (Tr. 366.)  She believed that she had bronchitis and reported that her headache was a "typical headache for her."  *Id.*  The attending physician, Dr. David Lanier,

7

observed that she was "in no acute distress," did "not appear toxic or unwell," and "look[ed] quite normal" despite occasionally coughing.  *Id.*  She had a "completely normal neurologic exam" and Dr. Lanier gave her Compazine and Benadryl for her headache and Tylenol for her aches and pains. (Tr. 367.)  He added that, "I am avoiding the use of narcotics in this patient who has been in this emergency department on numerous occasions in the past frequently with painful conditions, and I do not really feel comfortable possibly contributing to her continued use of narcotics under these circumstances."  *Id.*  She was diagnosed with "[a]cute cephalgia," "[a]cute cough," "[a]cute respiratory infection," and "[a]cute myalgias." *Id.*  She returned to the Sumner emergency room on April 10, 2009, with chest pain, which she described as intermittent, lasting "a few seconds per episode," "worse when she ben[t] over," and "associated with mild shortness of breath."  (Tr. 363.) The attending physician, Dr. William Little, noted that there was "no evidence . . . of a cardiac cause of her discomfort" and that "[s]he most likely has had a chest wall muscle strain."  (Tr. 364.)  He gave her Lortab and Vistaril for her pain that night and instructed her to take Tylenol and Motrin as needed.  *Id.*

On July 7, 2009, the plaintiff presented to the Hendersonville Medical Center emergency room with low back pain.  (Tr. 448.) She was diagnosed with "[a]cute lumbar strain," given Toradol at the emergency room, prescribed Flexeril, and instructed to apply ice.  (Tr. 449.)  Later the same day, the plaintiff presented with low back pain to Mr. O'Leary at ClinicCare and was prescribed Hydrocodone.  (Tr. 467.)

**B. Hearing Testimony**

At the hearing, the plaintiff was represented by counsel, and both the plaintiff and Rebecca Williams, a vocational expert ("VE"), testified. (Tr. 31-77.) The plaintiff testified that she lived with her husband, daughter, and two grandchildren. (Tr. 36.) She testified that she had an eighth-grade education and had not obtained a GED but was able to read and write English. (Tr. 38.) She testified that she smoked approximately one pack of cigarettes per day but did not drink alcohol or use "street drugs." (Tr. 38-39.)

The plaintiff testified that she previously worked as a laundry aide at Gallant Healthcare for approximately sixteen years but stopped working in 2006 due to a "number of illnesses" including a mass on her right ovary that required surgery. (Tr. 37, 39-40.) She said that she attempted to return to work for a few days in August 2006, but was unable to perform the work. (Tr. 39-40.) The plaintiff testified that neither her husband nor daughter worked and that her daughter and granddaughter received SSI benefits. (Tr. 65-66.)

The plaintiff reported having "real bad migraine headaches all the time," occurring "about every other day" and lasting for three days "on a regular basis." (Tr. 41-42.) She testified that a "regular" headache lasts about eight hours and results in blurred vision, vomiting, and dizziness. (Tr. 42.) She explained that before going to the hospital for a headache, she would lie down, turn the lights down, put on "shade glasses," and take medication. (Tr. 58-59.) She reported that headaches caused her to miss "a lot" of work, which resulted in her being suspended and losing vacation time. (Tr. 42-43.) She testified that, although she would sometimes work with a headache, she was absent from work "seven or more" days in a typical month. (Tr. 43, 60.)

The plaintiff reported that she had arthritis in her left hand and both shoulders and that she suffered "excruciating" pain "every day" in her low back and both legs, causing numbness in her feet. (Tr. 44-45.) She testified that she had swelling in her knees every day but that some days were worse than others. (Tr. 61.) The plaintiff also testified that she had COPD, which caused her to cough and pant. (Tr. 46.) She explained that she used an Advair inhaler but that air fresheners, chemicals, heat, "walk[ing] too fast," and "talk[ing] too much" caused shortness of breath. (Tr. 46-47, 53-55.)

The plaintiff testified that she attended physical therapy but stopped because it made her back and leg pain worse. (Tr. 50.) She testified that she wore a knee brace and a back brace when sleeping. *Id.* She also testified that she used a cane "to get around" and "keep [her] balance" and that she had "fallen several times" without a cane. (Tr. 61.) She explained that she held the cane in her right hand and was thus unable to use her right hand while holding the cane. *Id.* The plaintiff testified that her pain medication made her drowsy and that she often sat in a recliner after taking her medicine, adding that, when she is home, she spends the "majority" of her time in a chair or in bed. (Tr. 54, 56-57.)

The ALJ asked the plaintiff about a specific instance in July 2009, when she went to the emergency room and was prescribed Flexeril and Toradol and then went to a walk-in clinic the same day. (Tr. 62.) The plaintiff explained that she could not take Flexeril and was unaware that the emergency room physician had prescribed Flexeril. *Id.* She explained that she usually went to the walk-in clinic for financial reasons and returned there instead of the emergency room. (Tr. 62-63.) She could not specifically recall whether she told Mr. O'Leary at the walk-in clinic that she had been

to the emergency room the same day and had been prescribed medication, but she believed that she did.  (Tr. 63-64.)

The VE testified that her testimony was consistent with the Dictionary of Occupational Titles ("DOT") and classified the plaintiff's past relevant work as a "laundry aide in a medical setting" as medium, unskilled work with a Specific Vocational Preparation ("SVP") level of two.[7]  (Tr. 67.) The ALJ asked the VE to consider a hypothetical person with the same education and work experience as the plaintiff who was "limited to sitting for six hours, standing and walking for six hours;" who had the ability to lift and carry fifty pounds occasionally and twenty-five pounds frequently; and who needed to avoid fumes, odors, gases, poor ventilation, and hot and cold extremes.  (Tr. 68.)  The VE replied that such a person would be able to perform the plaintiff's past relevant work.  *Id.*

As a second hypothetical question, the ALJ asked the VE to consider a person who was "limited to sitting six hours, standing . . . six hours, walking two hours with the ability to lift and carry twenty pounds occasionally and ten pounds frequently, also with the need to avoid extremes in cold and heat and fumes, odors, gases, [and] poor ventilation."  *Id.*  The VE responded that such limitations would preclude the plaintiff's past relevant work but that such a person could perform a limited range of light work including jobs as a bottling line attendant, label coder, and production

---

[7] The SVP "is defined as the amount of elapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation."  U.S. Dep't of Labor, Dictionary of Occupational Titles 1009 (4th ed. 1991).  It is measured on a scale from 1-9 on which the higher number assigned to a job, the greater the length of time that is required to be able to perform the job.  *Id.*  An SVP level of two indicates that more than a "short demonstration up to and including one month" of training is necessary to perform that specific work.  *Id.*

assembler.  (Tr. 69.)  The VE explained that these jobs were typically performed in factory settings with production pace requirements.  (Tr. 72.)

As a third hypothetical question, the ALJ asked whether there would be available jobs for a person who was limited to sitting eight-hours per day and must also avoid extreme cold and heat, fumes, odors, gases, and poor ventilation.  *Id.*  The VE replied that this would constitute sedentary, unskilled employment and identified representative jobs as a buckle wire inserter,[8] film touch-up inspector, and cuff folder.  (Tr. 69-70.)  Finally, the ALJ asked whether the plaintiff would be able to return to her past relevant work or any other work if all her testimony were accepted as credible, and the VE replied that she would not.  (Tr. 70.)  The VE characterized the plaintiff's reported work absences as "excessive" and explained that an employer would "generally" permit a worker to miss "less than one day per month."  (Tr. 70-72.)

## III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on December 18, 2009.  (Tr. 16-26.)  Based upon the record, the ALJ made the following findings:

1.      The claimant meets the insured status requirements of the Social
         Security Act through December 20, 2011.[9]

---

[8] The VE explained that a buckle wire inserter was an assembler job found at DOT code 734.687-034.  (Tr. 69-70.)

[9] As the plaintiff correctly notes in her memorandum (Docket Entry No. 14, at 2 n.1), the ALJ mistakenly found that the plaintiff's date last insured was December 20, 2011.  (Tr. 18.)  The plaintiff's insured status would not expire in the middle of a month, but rather the last day of the quarter in which she met the earnings requirement.  *See* 42 U.S.C. §§ 413(a)(1); 423(a)(1)(A),(c)(1). Presumably, the ALJ intended to indicate that the plaintiff's date last insured was December 31, 2011.  (Tr. 139, 151.)

2.  The claimant has not engaged in substantial gainful activity since August 23, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

* * *

3.  The claimant has the following severe impairments: lower back pain, migraine headache, chronic obstructive pulmonary disease, and osteoarthritis (20 CFR 404.1520(c) and 416.920(c)).

* * *

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) which includes the ability to sit 6 hours in an 8 hour workday; stand 6 hours in an 8 hour workday; walk 2 hours in an 8 hour workday; lift/carry 20 pounds occasionally and 10 pounds frequently; avoid exposure to cold/heat, fumes, gases, poor ventilation.

* * *

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

* * *

7.  Born on January 29, 1961, the claimant was 45 years old on August 23, 2006, which is defined as a younger individual age 18-49 (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  The claimant possesses no vocational skills that are transferable to other occupations (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

(Tr. 18-24.)

## IV. DISCUSSION

### A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir.

2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart*

*v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).   Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).  The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment.   42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience.  *Id.*  (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).   The plaintiff may establish that she meets or equals a listed impairment and that the impairment has lasted or is expected to last for at least twelve months or result in death.  *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability.  *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled.  *Id.*  The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant.  *Cruse*, 502 F.3d at 539;

*Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying her burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged onset date. (Tr. 18.) At step two, the ALJ determined that the plaintiff had the severe impairments of lower back pain, migraine headaches, COPD, and osteoarthritis. *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* At step four, the ALJ determined that the plaintiff was not capable of performing her past relevant work. (Tr. 24.) At step five, the ALJ determined that the plaintiff was capable of working as a bottle line attendant, label coder, and production assembler.[10] (Tr. 24-25.)

---

[10] The ALJ also found that the plaintiff could work as an assembler buckler, film touch-up inspector, and cuff folder. (Tr. 25.) At the hearing, the VE testified that these sedentary, unskilled jobs could be performed by a person who was limited to sitting eight hours a day and needed to avoid extreme cold and heat, fumes, odors, gases, and poor ventilation. (Tr. 69-70.) As the defendant concedes in her memorandum, the ALJ ultimately found that the plaintiff had a different RFC. Docket Entry No. 19, at 17 n.9; (tr. 19). Consequently, the ALJ should not have relied on the VE's answer to this hypothetical question and thus had no basis for finding that the plaintiff could perform these sedentary jobs. Nevertheless, this error is harmless because the ALJ properly identified three other jobs that the plaintiff could perform given her RFC (*i.e.*, bottle line attendant, label coder, and production assembler).

**C. The Plaintiff's Assertions of Error**

First, the plaintiff argues that the ALJ erred in evaluating her credibility. Docket Entry No. 14, at 17-20. Second, the plaintiff argues that the ALJ did not consider the effects of her migraine headaches on her vocational abilities. *Id.* at 13-15. Third, the plaintiff argues that the ALJ "did not consider the vocational impact of [her] need for an assistive hand-held device for standing or walking during the workday." *Id.* at 15-17. Finally, the plaintiff argues that the ALJ erred in posing hypothetical questions to the VE. *Id.* at 20-21.

**1. Credibility**

The plaintiff contends that the ALJ erred in evaluating her credibility. Docket Entry No. 14, at 17-20. Specifically, the plaintiff challenges the reasons given by the ALJ for finding her not credible and also contends that the ALJ "did not consider all relevant factors" outlined in 20 C.F.R. §§ 404.1529(c) and 416.929(c)(2) and Social Security Ruling 96-7p. *Id.*

The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp. 2d 954, 958 (N.D. Ohio 2003) (citing *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. July 7, 1994)).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL

374186, at *4.  In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence.  *Id.* at *5.  Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect."  *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011).  The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight.  Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the SSA and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain.  *See* 20 C.F.R. § 404.1529; *Felisky*, 35 F.3d at 1037.  While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there.  In *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847 (6th Cir. 1986), the Sixth Circuit set forth the basic standard for evaluating such claims.[11]  The *Duncan* test has two prongs.  The first prong is whether there is objective medical evidence of an underlying medical condition.  *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853).   The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain."  *Id.*  This test does not require objective evidence of the pain itself.  *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

[11] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987.  *See Felisky*, 35 F.3d at 1039 n.2.

After discussing the plaintiff's testimony and treatment history, the ALJ explained that:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible as documented by records from treating sources and examining sources as discussed in the preceding paragraphs. Claimant has a long work history (16 years) as a laundry aide for a nursing home. She stopped working in August 2006 after surgery to remove ovarian cysts. Claimant alleges that migraines, low back pain, chronic obstructive pulmonary disease, and stomach swelling keeps her from working. However, the records from treating and examining sources as well as the objective findings are minimal and unrevealing. Claimant testified that she had migraines all her life, including all the while she was working. Although she reportedly missed a lot of work, she was kept on and worked full time. The record also indicates possible drug seeking tendencies on her part as she sought medications on the same day from two different sources . . . and emergency room records note that narcotics were refused because of the frequency of visits. Claimant lives with her husband, daughter, and two grandchildren. Apparently, neither the husband nor daughter work. In fact, the daughter and one of the grandchildren are disabled and receive Supplemental Security Income benefits.

(Tr. 23-24; internal citations omitted.)

The ALJ satisfied the first prong of the *Duncan* test when he concluded that the plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. 23.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. § 404.1529(c). The ALJ cannot ignore the plaintiff's statements detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. § 404.1529(c)(2). Besides reviewing medical records to address

the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. § 404.1529(c)(3).[12]

The plaintiff challenges four specific aspects of the ALJ's credibility determination. Docket Entry No. 14, at 19-20. First, the plaintiff challenges the ALJ's finding that treatment records and objective findings were "minimal and unrevealing" despite the plaintiff's claims that her migraines, low back pain, COPD, and stomach swelling were disabling conditions. *Id.* at 19. The plaintiff points to countervailing evidence in the record, including her own subjective complaints, but does not explain why it was improper for the ALJ to note the lack of significant objective findings as one factor in his decision.

The plaintiff underwent a series of brain scans that were all normal. (Tr. 258, 417-18, 425, 431.) Likewise, scans of her right shoulder (tr. 430), cervical and lumbar spine (tr. 346-47, 422, 424, 429), right leg (tr. 257), and right hip (tr. 345, 423) were all normal. After summarizing the plaintiff's treatment history, the ALJ noted that, "[o]bjective testing has generally been within normal limits. Examinations by treating and examining sources including Mr. O'Leary, Dr. Kabtimer, Sumner County Health Department, Dr. Bacon, and Dr. Gomez were unrevealing with minimal spine tenderness and good range of motion. Symptoms were managed/controlled with

---

[12] The seven factors under 20 C.F.R. § 404.1529(c)(3) include: (i) the plaintiff's daily activities; (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms; (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms; (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning the plaintiff's functional limitations and restrictions due to pain or other symptoms.

medications." (Tr. 23.) The ALJ also noted that "numerous chest x-rays were within normal limits and examinations [of] the lungs were normal." *Id.*

The ALJ was entitled to rely on the objective medical record when evaluating the plaintiff's subjective complaints of pain. The ALJ did not rely exclusively on objective evidence, but rather used the lack of objective findings as one factor in his overall credibility assessment. Although the plaintiff cites other evidence in the record and argues for a different conclusion, she has failed to show that the ALJ erred in relying on the lack of objective findings as part of his credibility assessment.

Second, the plaintiff argues that the ALJ erroneously concluded that her complaints of disabling headaches were not credible due to the fact that she worked for sixteen years despite those headaches. Docket Entry No. 14, at 19. The plaintiff contends that her employer "was exceptionally tolerant of her absenteeism, which suggests [that she] was a good worker when she was able to work, but she had reached the point where her multiple problems precluded regular work attendance." *Id.* The Court notes that, other than the plaintiff's testimony that she missed approximately seven days of work per month, there is no evidence of the plaintiff's history of absenteeism documented in the record. There is also not any evidence in the record that the plaintiff's former employer "was exceptionally tolerant of her absenteeism." In fact, the plaintiff testified at the hearing that her employer threatened to "get rid" of her because of her absenteeism. (Tr. 43.) The ALJ reasonably concluded that the plaintiff's testimony that her migraine headaches resulted in significant absenteeism was inconsistent with the fact that she had maintained employment for sixteen years.

Third, the plaintiff refutes the ALJ's conclusion that she demonstrated "possible drug seeking tendencies." Docket Entry No. 14, at 19. The ALJ cited one occasion when the plaintiff "sought

medications on the same day from two different sources" as well as "emergency room records

not[ing] that narcotics were refused because of the frequency of visits." (Tr. 24.) On July 7, 2009,

the plaintiff presented to the Hendersonville Medical Center emergency room with back pain.

(Tr. 448-51.) The attending physician instructed the plaintiff to apply ice and prescribed Flexeril and

Toradol. (Tr. 449.) Later the same day, the plaintiff also presented to Mr. O'Leary at ClinicCare

with back pain, and he prescribed her Hydrocodone. (Tr. 467-68.) At the hearing, the ALJ

questioned the plaintiff:

> Q: Ms. Talley, have you ever gone to the emergency room and . . . gone right back?
> A: Excuse me, sir?
> Q: Have you ever gone to an emergency room for treatment, and then gone, gone home, gone right back?
> A: Yes, sir.
> Q: Or gone –
> A: Like the next day, uh-huh.
> Q: Have you ever gone to the emergency room and then gone . . . to another doctor[13] to get more medication the same day?
> A: No, sir.
> Q: Okay. Sure about that?
> A: Yeah, I guess.
> Q: In July of 2009, you went to the ER and got Flexeril and Toradol in the morning, and then that afternoon, you went back to a walk-in clinic. . . .
> A: Okay. Yeah –
> . . . .
> A: – I recall that. I can't take Flexeril.
> Q: And did you tell the doctor at the hospital that?
> A: I didn't know what he prescribed me, sir.
> Q: Okay. So why didn't you go back to the ER, to the doctor that gave you the first drug? Why did you go to another doctor?
> A: That's the doctor I usually normally go to, the –
> Q: The walk-in clinic?
> A: – walk-in clinic. Yes, sir.
> Q: Why didn't you go to him –
> A: The cost of medicines that they gave me, you know, wasn't, it wasn't helping me.

---

[13] Throughout this discussion, both the ALJ and the plaintiff mistakenly referred to Mr. O'Leary, a physician's assistant, as a medical doctor. (Tr. 62-64.)

Q: Okay. Why didn't you go to him in the first place?
A: Well, I really didn't have the money from my mama. Even my daughter won't pay for it. See, when I go to the emergency room, they bill me for it, which I'm being sued for several hospital bills now. They don't ask you to pay it up front.
Q: Okay.
A: That's why I went to the emergency room in the first place, because I didn't have to pay cash money.
Q: And that's Dr. O'Leary at the walk-in clinic?
A: Yeah, Dr. O'Leary is walk-in clinic.
. . . .
Q: Did you tell Dr. O'Leary that day that you've been in the ER that morning?
A: I believe I did, sir.
Q: And that they had –
A: I don't recall.
Q: – given you some medication?
A: Probably so.
Q: Yeah. Because I don't see anything about it in the record. Okay.

(Tr. 62-64.)

The plaintiff argues that she "explained the circumstances surrounding" her visits to the emergency room and ClinicCare on July 7, 2009, and that "[t]his one incident hardly constitutes 'drug seeking tendencies.'" Docket Entry No. 14, at 19. It is the ALJ's responsibility to evaluate the plaintiff's credibility, and the ALJ's credibility decision is entitled to deference. *See Buxton*, 246 F.3d at 773. Although the plaintiff offered an explanation for making multiple trips to medical care providers on the same day for the same ailment, the ALJ plainly rejected that explanation. Having seen and heard the plaintiff, it was the ALJ's prerogative to do so, and the Court will not disturb his credibility finding. Further, as the defendant notes, the plaintiff's behavior on July 7, 2009, was not an isolated incident as she contends. Docket Entry No. 19, at 15. The ALJ also discussed an occasion on March 11, 2009, in which the plaintiff presented to the Sumner emergency room and was denied narcotics due to the frequency of her visits. (Tr. 21, 24, 366-67.) The ALJ's conclusion

that the plaintiff demonstrated "possible drug seeking tendencies" (tr. 24) and his decision to discount her credibility on that basis are supported by the record.

Fourth, the plaintiff faults the ALJ for referring to the fact that her husband and daughter are unemployed and that the plaintiff's daughter and granddaughter receive SSI benefits. Docket Entry No. 14, at 19-20; tr. 24. The defendant argues that the ALJ was merely "summariz[ing] [the plaintiff's] testimony regarding her living arrangement." Docket Entry No. 19, at 16. It is unclear what the ALJ meant when he referred to the employment and disability status of the plaintiff's family. Although the ALJ addressed the plaintiff's family within his broader assessment of the plaintiff's credibility, the ALJ did not explain what role this information had on his decision. To the extent that the ALJ considered the employment and disability status of the plaintiff's family as a factor in his credibility assessment, such consideration was inappropriate. The record does not contain any evidence to support a connection between the plaintiff's disability status and the fact that some of her family members do not work and/or receive SSI benefits. However, the Court ultimately concludes that any such consideration was harmless error. The ALJ sufficiently explained several other reasons, outlined above, for his decision to discount the plaintiff's credibility. Even if the ALJ drew some unstated conclusion from the fact that some of the plaintiff's family members do not work, the ALJ provided several other adequate reasons for discrediting the plaintiff's allegations.

In addition to these specific complaints, the plaintiff also argues generally that the ALJ "did not consider all relevant factors in evaluating [her] credibility." Docket Entry No. 14, at 17. The ALJ is not required to make a finding regarding each and every factor bearing on credibility. *See McCoy v. Astrue*, 2010 WL 3766473, at*6 (E.D. Mich. Sept. 21, 2010) ("There is no requirement that an ALJ make a detailed, on the record finding of every single factor in SSR 96-7p and 20 C.F.R.

§ 404.1529.") The ALJ set forth a detailed explanation for his credibility finding that is well supported by the record and sufficiently demonstrates that the ALJ considered the entire record as well as the relevant factors in section 404.1529(c) and Social Security Ruling 96-7p. The Court finds that the ALJ properly weighed the evidence in the record and did not err in determining that the plaintiff's allegations of disability were not fully credible.

### 2. Headaches

The plaintiff argues that the ALJ erred by not considering the effect of her "absenteeism attributable to her chronic, recurrent, and intractable headaches." Docket Entry No. 14, at 13. Specifically, the plaintiff contends that the ALJ erroneously dismissed her complaints of headaches because of normal brain scans and that the ALJ mistakenly believed that her headaches must last twelve months in order to be disabling. *Id.* at 14-15.

In his decision, the ALJ noted that the plaintiff reported having:

> bad migraine headaches that occurred 3 times a week with blurred vision and nausea/vomiting. Some of the headaches lasted for 3 days and some for 8 hours. She had to go to bed during a bad headache. These headaches had occurred for a long time even when working and caused her to miss a lot of work that she estimated at about 7 days a month.

(Tr. 19.) The ALJ discussed the plaintiff's headache complaints in some detail (tr. 20-22), concluding that:

> There were recurrent headaches with frequent emergency room visits for pain medications. However, repeated neurologic workups were negative with brain scans and CT scans of the head normal. Other factors contributing to headaches were frequent sinus problems with sinus pressure and congestion. Claimant reported to Mr. O'Leary at ClinicCare that headaches were triggered by stress and moderately limited activities. Therefore, it is determined that headaches were not at a frequency or severity as to prevent work activity for a period of 12 continuous months.

(Tr. 22.)

The plaintiff implies that the ALJ improperly dismissed her headaches solely because her brain scans returned normal. Docket Entry No. 14, at 14. As noted above, the plaintiff underwent multiple brain scans that were all normal (tr. 258, 417-18, 425, 431), and the ALJ was entitled to rely on this objective evidence as part of his credibility assessment. *See Felisky*, 35 F.3d at 1039. *See also* 20 C.F.R. § 404.1529(c)(2). Moreover, the ALJ did not rely exclusively on the plaintiff's negative brain scans in discounting the limiting effects of her headaches. The ALJ also noted that the plaintiff's headaches were associated with stress, sinus pressure, and congestion and that the plaintiff reported that her headaches only moderately limited her activity. (Tr. 22.) Rather than disregarding the plaintiff's headaches, the ALJ in fact addressed them in detail but found that they were not frequent or severe enough to be disabling. (Tr. 22, 24.)

Likewise, the ALJ did not disregard the plaintiff's reports of absenteeism due to headaches. Rather, he found her reports not credible. As discussed above, in his credibility finding, the ALJ specifically noted that the plaintiff "reportedly missed a lot of work" but "was kept on and worked full time" despite having headaches her whole life. (Tr. 24.) The ALJ clearly considered the plaintiff's alleged absenteeism but concluded that her testimony was inconsistent with the fact that she had maintained a job for sixteen years.

The plaintiff also challenges the ALJ's conclusion that her "headaches were not at a frequency or severity as to prevent work activity for a period of 12 continuous months." (Tr. 22.) The plaintiff contends that "the ALJ appears to be under the mistaken impression that a headache must last 12 consecutive months to be disabling." Docket Entry No. 14, at 15. However, the ALJ did not find that the plaintiff's headaches must last for 12 consecutive months to be disabling.

Rather, he found that her headaches were not frequent or severe enough *to prevent her from working* for a period of 12 consecutive months. This is the appropriate standard for disability. *See* 20 C.F.R. §§ 404.1505(a), 416.905(a) ("The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.").

### 3. Cane

The plaintiff argues that the "ALJ did not consider the vocational impact of [her] need for an assistive hand-held device for standing or walking during the workday." Docket Entry No. 14, at 15. She also argues that, because she testified that she held the cane in her dominant right hand, she would have "no functional use of her dominant upper extremity to perform essential work activities" while standing or walking. *Id.* The defendant contends that the ALJ accounted for the plaintiff's cane use by limiting her to walking for two hours per workday and that further limitations are not supported by the record. Docket Entry No. 19, at 11-13.

As this Court has previously explained:

[T]he Sixth Circuit has held that if a cane is not a necessary device for the claimant's use, it cannot be considered a restriction or limitation on the plaintiff's ability to work. *Carreon v. Massanari*, 51 Fed. Appx. 571, 575 (6th Cir. 2002). This device must be so necessary that it would trigger an obligation on the part of the [SSA] to conclude that the cane is medically necessary. *Penn v. Astrue*, 2010 WL 547491, at *6 (S.D. Ohio Feb. 12, 2010). A cane would be medically necessary if the record reflects more than just a subjective desire on the part of the plaintiff as to the use of a cane. *Id.* If the ALJ does not find that such device would be medically necessary, then the ALJ is not required to pose a hypothetical to the VE. *Casey v. Sec'y of Health Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). The ALJ is only required to pose to the VE those limitations found to be credible. *Id.*

Report and Recommendation entered in *Murphy v. Astrue*, 2013 WL 829316, at *10 (M.D. Tenn. Mar. 6, 2013) (Brown, M.J.) and adopted by the Court, 2013 WL 4501416 (M.D. Tenn. Aug. 22, 2013) (Nixon, J.).

There is conflicting evidence in the record concerning the plaintiff's cane use. She testified that she used a cane for balance and that she had "fallen several times" without a cane. (Tr. 61.) She explained that she was right-hand dominant and would be unable to use that hand while holding the cane. *Id.* The record shows that she sometimes presented to medical care providers with a cane (tr. 301, 351-52, 478), and Dr. Bacon noted that she used a cane when she applied for a temporary disability parking placard. (Tr. 335.) At an emergency room visit, the attending physician noted that she walked with a cane but that "her gait [was] only slightly antalgic." (Tr. 301.) The plaintiff presented with a cane to her consultative examination with Dr. Gomez and told him that it "was prescribed by her physician" and that "she use[d] it all the time." (Tr. 352.) Dr. Gomez observed that "[w]ithout a cane, she ha[d] a limp" and that "[i]t is believed that the [plaintiff] would require her cane for balance during ambulation." (Tr. 351-52.) Nonexamining DDS consultative physicians, Drs. Colvin and Bell, found, respectively, that the cane had not been prescribed (tr. 293) and that there were "no objective findings to support [the] need for [a] cane." (Tr. 360.)

In summarizing the plaintiff's medical history, the ALJ noted on several occasions that the plaintiff used a cane. (Tr. 19-22.) When assessing her complaints of back pain, he observed that "[a]lthough claimant used a cane, gait was only slightly antalgic." (Tr. 22.) The ALJ did not include a limitation for cane use in the plaintiff's RFC or in a hypothetical question to the VE, nor did he explain his decision not to do so. (Tr. 19, 68-69.)

The plaintiff argues that the record supports her need for a cane for balance during ambulation and that "[t]he need for balance, and hence the use of a cane, would appear equally compelling for prolonged standing." Docket Entry No. 14, at 15. She also argues that, because she is right-handed and holds the cane in her right hand, "she has no functional use of her dominant upper extremity to perform essential work activities" while standing or walking. *Id.*

The defendant counters that the record does not support additional functional limitations associated with cane use. Docket Entry No. 19, at 11-13. First, the defendant contends that the ALJ provided for the plaintiff's need for a cane during ambulation by limiting her to walking only two hours a day. *Id.* at 12. Second, the defendant argues that while Dr. Gomez indicated that the plaintiff needed a cane for ambulation, he did not suggest that she also needed a cane while standing. *Id.* at 11-12. The defendant points to Dr. Gomez's observation that the plaintiff was able to stand on one leg normally, *i.e.,* without the use of a cane, and argues that "needing a cane for balance while walking does not necessarily mean that a person will need to use a cane for balance while standing." *Id.* Third, the defendant argues that there is no support in the record for the plaintiff's contention that she does not have functional use of her dominant upper extremity while standing or walking with a cane, noting that neither Dr. Gomez nor the DDS consultative physicians opined that she had manipulative limitations even though all of these doctors considered her cane use. *Id.* at 12-13.

The Court is unable to reach the merits of the parties' arguments, however, because the ALJ did not reach a conclusion regarding the plaintiff's alleged cane use. Although the ALJ summarized evidence related to the plaintiff's use of a cane, he never addressed whether such use was medically necessary. At one point, the ALJ noted that "[a]lthough claimant used a cane, gait was only slightly antalgic." (Tr. 22.) However, this statement is ambiguous. On the one hand, it affirms that the

plaintiff did in fact use a cane. At the same time, it implicitly diminishes the necessity of her cane use. But, it does not reach a definitive conclusion as to whether the plaintiff's RFC should include limitations related to cane use and, if not, why not. In fact, nowhere in his decision does the ALJ explain whether the plaintiff's cane use was medically necessary.

The parties' memoranda share the same confusion. The plaintiff assumes that she requires a cane and argues that the ALJ failed to include the appropriate restrictions. Docket Entry No. 14, at 15-17. The defendant surmises that the ALJ "gave [the plaintiff] the benefit of the doubt[] and acknowledged that she used a cane" (Docket Entry No. 19, at 13 n.7), but the defendant also contends that the record does not support limitations, beyond a two-hour walking limitation,[14] associated with the use of a cane. The Court cannot address these arguments without first knowing what the ALJ decided regarding the plaintiff's cane use and his basis for that decision.

It is the ALJ's role as the trier of fact to weigh all the evidence and to make credibility assessments of the evidence and testimony in the record. *See Bailey v. Comm'r of Soc. Sec.*, 173 F.3d 428, 1999 WL 96920, at *3 (6th Cir. 1999) (unpublished); *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227(6th Cir. 1988). As the Sixth Circuit explained in *Bailey*, "agency rulings must clearly articulate the rationale underlying the decision" in order to be afforded substantial deference. *Bailey*, 1999 WL 96920, at *3 (citing *Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985)). The Sixth Circuit also explained that "[i]t is *absolutely essential* for meaningful appellate review" that the ALJ articulate his reasons "for crediting or rejecting particular sources of evidence." *Id.* (emphasis in original). Consequently, "an ALJ's

---

[14] The Court notes that the ALJ did not indicate that the two-hour walking limitation that he included in the plaintiff's RFC was related to the plaintiff's cane use.

decision must articulate with specificity reasons for the findings and conclusions that he or she makes." *Id.* *See also* Social Security Ruling 82-62 (providing that the ALJ's decision must "follow an orderly pattern and show clearly how specific evidence leads to a conclusion.").

The evidence in the record on this issue is conflicting, and it is not the Court's role to weigh the evidence for the first time. Although the ALJ appropriately considered the fact that the plaintiff used a cane, he failed to adequately explain whether her cane was medically necessary. The references that the ALJ made concerning the plaintiff's use of a cane make it unclear whether a limitation for cane use should be included in the plaintiff's RFC. Because the ALJ never squarely addressed this issue, the Court lacks a sufficient foundation for meaningful judicial review. Consequently, the Court concludes that the ALJ's decision should be reversed and the case remanded. On remand, the ALJ should determine whether the plaintiff's use of a cane is medically necessary, and, if so, include the appropriate functional limitations in the plaintiff's RFC. If appropriate, the ALJ should obtain a consultative examination and functional assessment to aid in making this determination.

### 4. VE testimony

The plaintiff also argues that the ALJ improperly relied on the VE's testimony. Docket Entry No. 14, at 20-21. Specifically, the plaintiff argues that the hypothetical question posed by the ALJ to the VE did not include limitations for the plaintiff's "expected level of absenteeism exceeding one day per month and her need for a hand-held assistive device." *Id.* at 20.

A VE's testimony is commonly used at step five in the sequential analysis to determine whether a plaintiff is capable of performing his past relevant work. *See Delgado v. Comm'r of Soc.*

*Sec.*, 30 Fed. Appx. 542, 548 (6th Cir. 2002). The VE's testimony in response to an ALJ's hypothetical question will be considered substantial evidence only if the hypothetical question "accurately portrays [the plaintiff's] individual physical and mental impairments.'" *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007) (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). Although a hypothetical must accurately portray a plaintiff's impairments, an ALJ "is required to incorporate only those limitations that he accepts as credible." *Id.* (quoting *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

The hypothetical question that the ALJ posed to the VE limited the plaintiff to lifting and/or carrying twenty pounds occasionally and ten pounds frequently; sitting six hours, standing six hours, and walking two hours in an eight-hour workday; and avoiding exposure to cold, heat, fumes, gases, and poor ventilation. (Tr. 19, 68.) The VE responded that a person with these limitations could work as a bottling line attendant, label coder, or production assembler and that each of these jobs existed in significant numbers in the national and state economies. (Tr. 69.) The ALJ relied on this testimony in determining at step five that the plaintiff could perform some work given her RFC. (Tr. 24-25.)

The plaintiff contends that the ALJ should have included limitations for her expected absences due to headaches and her need to use a cane. As noted above, the ALJ found that the plaintiff's headaches were not frequent or severe enough to cause her to miss work as often as she claimed. Consequently, the ALJ did not have to include limitations in his hypothetical question that he found not credible. *See Griffeth*, 217 Fed. Appx. at 429. Inasmuch as it is unclear whether it was medically necessary for the plaintiff to use a cane, it is also unclear whether the ALJ should have

included limitations associated with the use of a cane in a hypothetical question to the VE. In other words, if the ALJ had concluded that it was medically necessary for the plaintiff to use a cane, such limitations should have been included in a hypothetical question. However, because the ALJ did not make such a determination, the Court cannot determine whether such a limitation should have been included in the hypothetical question.

## V. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 13) be GRANTED to the extent that the case should be REMANDED to the Commissioner. On remand, the ALJ should determine whether the plaintiff's use of a cane is medically necessary, and, if so, include the appropriate functional limitations in the plaintiff's RFC. If appropriate, the ALJ should obtain a consultative examination and functional assessment to aid in making this determination.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

JULIET GRIFFIN
United States Magistrate Judge